## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SERGEY ALEYNIKOV,

      Plaintiff,

v.

MICHAEL McSWAIN, et al.,

      Defendants.

Civ. No. 15-1170 (KM)

**OPINION**

### KEVIN MCNULTY, U.S.D.J.:

This is an action brought pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971). The plaintiff, Sergey Aleynikov, alleges that two FBI Special Agents, Michael McSwain and Eugene Casey, along with various John Does, violated his constitutional rights by maliciously prosecuting him in state and federal court. He also alleges that the treatment of his personal property violated his constitutional rights.

Before the Court is defendants' motion to dismiss the complaint under FED. R. CIV. P. 12(b)(6). (ECF no. 13) For the reasons discussed below, I will grant defendants' motion in part.

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Factual Background | 2 |
| II. | Motion to Dismiss Standard | 6 |
| III. | Malicious Prosecution – Federal Charges (Counts 1–4) | 7 |
| | A. Statute of limitations | 7 |
| |   1. The NY and NJ statutes of limitations | 7 |
| |   2. The *Kato* rule points to NY | 8 |

1

|  | 3. | Miscellaneous arguments | 14 |
| B. | | Qualified Immunity | 16 |
|  | 1. | Constitutional violation | 18 |
|  |  | a. Initiation of proceedings | 18 |
|  |  | b. Probable cause | 20 |
|  | 2. | "Clearly established" violation | 22 |
| C. | | Allegations against Special Agent Casey | 24 |
| IV. | | Malicious Prosecution – NY State Charges (Counts 6–9) | 25 |
| V. | | Retention of Property (Count 5) | 28 |
| VI. | | *Bivens* Conspiracy (Count 10) | 31 |
| VII. | | Conclusion | 32 |

## I.   **FACTUAL BACKGROUND**

For purposes of this motion to dismiss only, I take the allegations of the complaint to be true. *See* p.6, *infra*.

Sergey Aleynikov is a computer programmer who was employed by Goldman Sachs from May 2007 through June 2009. He worked as part of a team responsible for developing source code relating to Goldman's high frequency trading ("HFT") system.

In April 2009, Aleynikov accepted an employment offer from Teza Technologies, a start-up company based in Chicago. While he was still employed by Goldman, Aleynikov uploaded source code from Goldman's HFT system to a server in Germany on two occasions; he did this on June 1 and June 5, 2009. (ECF no. 8-2 p. 4) Aleynikov then downloaded the material from the server to his home computer in New Jersey. (*Id.* p. 19) Aleynikov attempted to delete his internet history relating to the uploaded data. (*Id.* p. 20) Nevertheless, Goldman Sachs discovered Aleynikov's uploads on June 29, and it contacted the FBI two days later. (ECF no. 8 ("Am. Cplt.") ¶¶ 60-61)

Special Agent McSwain from the FBI's New York office was assigned to investigate Aleynikov's conduct; Special Agent Casey is McSwain's supervisor.

2

(Am. Cplt. ¶ 2) As part of his investigation into Aleynikov's conduct, Agent McSwain learned that Aleynikov had traveled to Chicago on July 2 and would return on July 3, 2009. (*Id.* ¶ 66) When Aleynikov arrived at Newark airport on July 3, McSwain, Casey, and a team of other FBI agents arrested him. (ECF no. 8-1 p. 6) The search of Aleynikov incident to that arrest yielded a thumb drive and laptop containing downloaded source code. (ECF no. 8-1 pp. 9-10, 15) McSwain interviewed Aleynikov after his arrest, and Aleynikov admitted (among other things) that he took source code from Goldman Sachs, that he knew his actions violated Goldman's policies, and that he had attempted to delete the history on his computer to cover his tracks. (ECF no. 8-1 pp. 14-16)

On July 4, 2009, a criminal complaint was filed in the Southern District of New York charging Aleynikov with one count of violating the Economic Espionage Act of 1996, 18 U.S.C. § 1832 ("EEA"), and one count of violating the National Stolen Property Act, 18 U.S.C. § 2314 ("NSPA"). (Am. Cplt. ¶ 70) Aleynikov was later indicted on these charges.[1] Before trial, Aleynikov moved to dismiss the charges against him, arguing that these statutes did not apply to his conduct. (Am. Cplt. ¶ 79) Judge Cote, in a lengthy written opinion, ruled that the NSPA and EEA did apply. *See U.S. v. Aleynikov*, 737 F. Supp. 2d 173 (S.D.N.Y. 2010), *rev'd*, 676 F.3d 71 (2d Cir. 2012). Aleynikov was convicted on both counts at trial. *See U.S. v. Aleynikov*, 785 F. Supp. 2d 46, 55 (S.D.N.Y. 2011), *rev'd*, 676 F.3d 71 (2d Cir. 2012). In post-trial motions, Aleynikov again argued that the NSPA and EEA did not apply to his conduct, and Judge Cote again rejected his legal arguments. *Id.* at 60-61. Aleynikov was sentenced to 97 months' imprisonment. (Am. Cplt ¶ 79)

Aleynikov appealed his convictions to the Second Circuit, relying on the legal arguments he had made before Judge Cote. On February 16, 2012, the United States Court of Appeals for the Second Circuit filed an order in which it agreed with Aleynikov. It reversed his convictions and ordered him released

---

[1]    In addition, a third count was added for violating the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"). However, this count was dismissed before trial and is not relevant to this motion to dismiss. (*See* Am. Cplt. (alleging malicious prosecution in the federal case based only on the EEA and NSPA charges)).

from custody after serving 51 weeks of his sentence. (Am. Cplt. ¶¶ 79-80) The Second Circuit subsequently filed an opinion in which it found that although Aleynikov had breached his confidentiality obligations to Goldman, his conduct did not fall within the scope of the charged federal offenses. Specifically, the Court of Appeals held that (a) intangible property such as source code does not constitute stolen "goods," "wares" or "merchandise" under the NSPA, and (b) the government had failed to establish that Goldman's high frequency trading system was intended for interstate commerce, as required by the EEA. *See U.S. v. Aleynikov,* 676 F.3d 71, 76-82 (2d Cir. 2012).

Shortly after Aleynikov's federal convictions were overturned, the District Attorney for New York County began investigating Aleynikov's conduct. (Am. Cplt. ¶ 81) On June 22, 2012, Aleynikov's attorney called McSwain to request the return of Aleynikov's passport and other personal property that had been retained in connection with the federal proceeding. (*Id.* ¶ 82) McSwain referred Aleynikov's counsel to the U.S. Attorney's Office. In late June and early July, 2012, Aleynikov's lawyer communicated with an AUSA in the Southern District of New York about the property. (Am. Cplt. ¶¶ 82-84) On July 12, 2012, AUSA Thomas Brown filed an *ex parte* application to Judge Cote, requesting to unseal the materials from the federal case. The application indicated that the materials were to be provided to the District Attorney's Office. (ECF no. 13-3; Am. Cplt. ¶ 85)[2] Judge Cote granted the application. Her order unsealing the materials was itself unsealed on November 26, 2012. (ECF no. 13-3 p. 2)

On August 2, 2012, Aleynikov was rearrested on state charges stemming from the same conduct that precipitated the federal prosecution. He was

---

[2]     On a 12(b)(6) motion, a court may consider certain materials even if they are not attached to the complaint. *See Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.),* 768 F.3d 284, 291 (3d Cir. 2012)("[D]ocuments that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim.") (internal quotations and citation omitted); *see also Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.,* 181 F.3d 410, 426 (3d Cir. 1999)("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.").

charged with two counts of Unlawful Use of Secret Scientific Material in violation of N.Y. Penal Law § 165.07 and one count of Unlawful Duplication of Computer Related Material under N.Y. Penal Law § 156.30(1). (*See* ECF no. 13-4) Aleynikov moved to dismiss the charges on legal grounds, but the motion was denied. (*See* ECF no. 13-5)[3]

In the state court proceeding, the jury found Aleynikov guilty of the first count of Unlawful Use of Secret Scientific Material; failed to reach a verdict on the other Unlawful Use count; and acquitted him on the Unlawful Duplication charge. (*See* ECF no. 8-2 p. 1) After trial, Aleynikov renewed his application to dismiss the Unlawful Use counts, arguing that his conduct was not covered by that law. In July 2015, in another lengthy opinion, the state court granted Aleynikov's motion and set aside his conviction. (*Id.* at 24-72).[4] The State has appealed that decision, and the appeal is pending. (Am. Cplt. ¶ 45)

The gist of Aleynikov's allegations here is that Agent McSwain, supervised by Agent Casey, did not properly investigate whether the federal statutes under which Aleynikov was charged applied to his conduct. (*See, e.g.*, Am. Cplt. ¶¶ 68, 70) He contends that McSwain blindly relied upon the complaints of Goldman Sachs and that McSwain should have known that Aleynikov did not violate the law. Therefore, Aleynikov says, McSwain should have known that he was violating Aleynikov's constitutional rights by pursuing his federal prosecution. In addition, Aleynikov alleges that upon the Second Circuit's decision reversing his federal convictions, McSwain took steps to ensure that Aleynikov would be prosecuted in state court, this time under state laws that McSwain knew did not apply. (*See e.g.*, Am. Cplt. ¶¶ 20, 22, 23)

---

[3]     The state court did, however, partially grant Aleynikov's motion to suppress. Judge Zweibel found that McSwain's arrest of Aleynikov as well as the transfer of Aleynikov's property to the District Attorney's Office violated the Fourth Amendment, and he disallowed the use of certain evidence in the state prosecution. (ECF no. 8-1 pp. 39-40, 64) The court admitted Aleynikov's confession made at the FBI's headquarters but suppressed his un-Mirandized statements made earlier at the airport. (*Id.* at 67-71)

[4]     In doing so, the court noted that "the issues in this case have never been easy" and that it "has no doubt that the People acted in good faith in this case to prosecute what they believed were serious crimes." (ECF no. 8-2 p. 72)

Aleynikov also alleges that McSwain knowingly violated his constitutional rights by orchestrating a plan to deprive Aleynikov of his property, not returning it to him as required, but instead transferring it to the New York District Attorney's Office for use in his state prosecution. (*See e.g.*, Am. Cplt. ¶¶ 17, 39, 82)

## II. MOTION TO DISMISS STANDARD

FED. R. CIV. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court *Twombly* case, *infra*).

FED. R. CIV. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678 (2009).

### III.  MALICIOUS PROSECUTION – Federal Charges (Counts 1–4)

#### A.  Statute of Limitations

Defendants seek dismissal on statute of limitations grounds of the *Bivens* malicious prosecution claim stemming from Aleynikov's federal prosecution. If New Jersey's two year statute is borrowed, the claim is barred; if New York's three year statute applies, it is timely. On a Rule 12(b)(6) motion, a complaint may be dismissed on statute of limitations grounds when it is clear from the "face of the complaint" that the limitations period has run. *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 n.14 (3d Cir. 2006). But because I find the longer, New York statute applicable, I will deny the motion to dismiss.

#### 1.  The NY and NJ statutes of limitations

Federal law determines the date that a *Bivens* claim accrues. *Peguero v. Meyer*, 520 F. App'x 58, 60 (3d Cir. 2013). A malicious prosecution claim accrues on the date that the underlying criminal proceeding is terminated in the plaintiff's favor. *Rose v. Bartle*, 871 F.2d 331, 349 (3d Cir. 1989). In this case, that would be February 16, 2012, when the Second Circuit overturned Aleynikov's convictions. Aleynikov filed this suit on February 12, 2015. That was more than two years, but just less than three years, after the date the claim accrued. The issue of whether the applicable statute of limitations is two years or three years is therefore a consequential one.

The statute of limitations itself (unlike accrual) is determined by state law. Because a *Bivens* claim is the "federal equivalent" of a claim under 42 U.S.C. § 1983, *Bivens* claims, like § 1983 claims, borrow the personal injury statute of limitations of the "applicable state." *Peguero*, 520 F. App'x at 60 ("A *Bivens* claim, like a claim pursuant to § 1983, is characterized as a personal-injury claim and thus is governed by the applicable state's statute of limitations for personal-injury claims.") (internal quotations and citations omitted) (citing *Wilson v. Garcia*, 471 U.S. 261, 275, 105 S. Ct. 1938 (1985)(holding that § 1983 claims are governed by the applicable state's statute of limitations)).

Here, there are two candidates for the "applicable state": New Jersey and New York. Defendants argue that because Aleynikov filed this action in New Jersey, New Jersey's two-year statute of limitations for personal injury claims should govern. *See* N.J. Stat. Ann. § 2A:14-2(a). Plaintiff argues that because the claim is for malicious prosecution, and the prosecution took place in New York, that state's analogous three-year statute of limitations applies. *See* N.Y. C.P.L.R. § 214(5).

## 2.   The *Kato* rule points to NY

So how is the Court to identify the "applicable state"? Although the matter is not free from doubt, I believe that a court considering a *Bivens* or § 1983 claim should borrow the statute of limitations of the state where the cause of action arose. Here, that state is New York.

I pause for an observation. For this issue to be consequential, three conditions must apply: (a) the forum state must differ from the state where the claim arose; (b) the two states' statutes of limitations must differ; and (c) the claim must be timely under one, but not the other. Such cases are not common. Even the cases discussing this legal issue do not usually turn on which state's limitations period is chosen; most commonly, for example, the forum state and the cause-of-action state are the same. As a result, the issue may not be fully explored.

In *Wallace v. Kato*, a § 1983 case, the U.S. Supreme Court first stated clearly the rule that the court should apply the statute of limitations of the state where the cause of action arose:

> Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: It is that which the State provides for personal-injury torts.

549 U.S. 384, 387, 127 S. Ct. 1091 (2007). That formulation has been reiterated and relied upon by the Third Circuit in precedential cases. *See Pearson v. Sec. Dep't of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015)("[A] § 1983 claim is governed by the statute of limitations that applies to personal injury

tort claims in the state in which such a claim arises.") (citation omitted); *Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850, 859 (3d Cir. 2014)("In determining the length of the statute of limitations for a claim arising under § 1983, courts must apply the limitations period applicable to personal-injury torts in the State in which the cause of action arose.")[5]

*Bivens* claims are, in general, construed in parallel to § 1983 claims. Accordingly, the rule of *Wallace v. Kato* has been cited and quoted by district courts within this Circuit considering *Bivens* claims. *See Burke v. MacArthur*, Civ. No. 15-6093, 2015 WL 5970725, at *4 (D.N.J. Oct. 13, 2015)("[T]he statute of limitations for a *Bivens* action, like a § 1983 action, is governed by the statute of limitations for personal injury torts under state law where the injury occurred.") (citations omitted); *Elhassan v. Goss*, Civ. No. 06-1000, 2007 WL 319484, at *5 (D.N.J. Jan. 30, 2007)(holding that "[t]he statute of limitations for a *Bivens* action, is determined by the statute of limitations for a personal injury action in the state where the incident forming the basis of the Complaint occurred") (citations omitted).

Defendants cite two non-precedential Third Circuit *Bivens* cases, dating from after *Wallace v. Kato,* that refer to the statute of limitations of the "forum state." In *Brown v. Tollackson,* the Third Circuit stated the rule thus:

> The statute of limitations for a *Bivens* claim, as for claims arising under 42 U.S.C. § 1983, is borrowed from *the forum state's* personal injury statute. *See Kost v. Kozakiewicz*, 1 F.3d 176, 190 (3d Cir. 1993); *King v. One Unknown Fed. Corr. Officer*, 201 F.3d 910, 913 (7th Cir. 2000) (same statute of limitations applies to actions under *Bivens* and § 1983).

314 F. App'x 407, 408 (3d Cir. 2008) (emphasis added). *See also Hughes v. Knieblher*, 341 F. App'x 749, 752 (3d Cir. 2009) ("Like civil rights claims

---

[5]     *See also Leonard v. City of Pittsburgh*, 570 F. App'x 241, 243 (3d Cir. 2014)("The statute of limitations for a claim under § 1983 is imported from the personal injury tort law of the state in which the injury occurred.") (citation omitted); *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 519 (6th Cir. 1997) ("[T]he proper limitations period for a § 1983 action is the limitations period for personal injury actions in the state in which the § 1983 claim arises."); *Faile v. Geary*, 958 F.2d 376 (9th Cir. 1992) ("Federal courts apply the statute of limitations of the state in which the claim arises for 42 U.S.C. § 1983 claims.").

brought pursuant to 42 U.S.C. § 1983, the statute of limitations for *Bivens* claims is taken from *the forum state's* personal injury statute.") (emphasis added).

I do not read *Brown* and *Hughes* as signaling a departure from the principle, stated in *Wallace v. Kato,* that the court must apply the statute of limitations "of the state in which the cause of action arose." As is so often the case, in *Brown* and *Hughes* the forum state *was* the state where the cause of action arose. So it was literally, if not doctrinally, true that forum law applied. Because the distinction made no difference in those cases, it was not considered or discussed.[6]

There is a certain awkwardness in "distinguishing" *Brown* and *Hughes* on the basis that the forum and cause-of-action state were identical. After all, that seems also to have been the scenario in *Wallace v. Kato, supra,* and the precedential Third Circuit cases following it. *Kato* was a civil rights action based on an arrest in Chicago, brought in the U.S. District Court for the Northern District of Illinois.[7] *Pearson, supra,* was a civil rights action brought by a Pennsylvania state prisoner in the U.S. District Court for the Western District of Pennsylvania. 775 F.3d at 600–01. *Estate of Lagano, supra,* involved

---

[6]     Both *Brown* and *Hughes* cite as authority for the "forum state" rule the Third Circuit case of *Kost v. Kozakiewicz,* 1 F.3d 176, 190 (3d Cir. 1993). *Kost,* however, long predated the 2007 Supreme Court case of *Wallace v. Kato.* In *Kost,* moreover, the forum state and the state where the harm occurred were the same: Pennsylvania. The only issue was whether to apply Pennsylvania's personal injury or contract statute of limitations.

        *Brown*'s reliance on *King v. One Unknown Fed. Corr. Officer* reinforces the notion that *Brown* was not truly signaling a departure from the rule that the statute of limitations is borrowed from the state where the claim arose. 201 F.3d 910, 913 (7th Cir. 2000) ("The statute of limitations for both § 1983 and *Bivens* actions is determined by the statute of limitations for personal injury actions in the state where the incident forming the basis of the claim occurred."). *Brown* cites *King* as support, without comment; nothing in *Brown* suggests that, by choosing the "forum" language, it intended to distinguish *King.*

[7]     549 U.S. at 387, 127 S. Ct. at 1094. The Supreme Court in *Kato* did not actually specify the district in which the case was filed. The district court case, however, is reported at 472 F. Supp. 2d 942 (N.D. Ill. 2004).

an allegedly unconstitutional search of a New Jersey home, and was brought in the U.S. District Court for the District of New Jersey. 769 F.3d at 752, 759.

So the point cannot be pressed too far. Nevertheless, if the identity between the forum state and the cause-of-action state does not distinguish *Brown* and *Hughes,* it helps to explain them. The issue simply did not matter, and it was not discussed. These non-precedential cases do not furnish me with a substantial basis to simply set aside considered language in a U.S. Supreme Court case, quoted and relied on in subsequent, precedential Third Circuit cases. Perhaps the forum-law rationale would have produced the same result in *Wallace v Kato* and the subsequent precedential Third Circuit cases. That does not mean that is *was* the rationale of those cases.

Lacking any strong contrary indication, I must conclude that the Supreme Court meant what it said in *Wallace v. Kato.* The rationales stated in subsequent precedential Third Circuit cases establish that they, too, took *Kato* at its word. Thus *Pearson, supra,* observed the doctrinal distinction; it applied the statute of limitations of Pennsylvania, but *not* because Pennsylvania was the forum state: "As Pearson's § 1983 *claims arise in Pennsylvania,* we must apply Pennsylvania's statute of limitations." 775 F.3d at 602 (emphasis added). Likewise, *Lagano, supra,* upheld application of New Jersey's two-year limitations period, not because New Jersey was the forum state, but because that was the statute of limitations "[i]n New Jersey, *where Lagano's claim arose.*" 769 F.3d at 859 (emphasis added). I consider myself bound by that language.

For the reasons stated above, cases in which this issue makes a difference are comparatively rare. What little district court authority exists, however, favors the rule I adopt today.

For example, in *Burke, supra,* Judge Renée Bumb considered a case in which the plaintiff, a federal prisoner incarcerated in New Jersey, asserted in New Jersey federal court a *Bivens* claim against the Assistant U.S. Attorney who prosecuted him in Chicago. 2015 WL 5970725, at *1. Judge Bumb cited the rule of *Wallace v. Kato* that the court must apply the statute of limitations

11

"under state law where the injury occurred." *Id.* at *4. She observed that "Burke's injuries arose out of the criminal proceedings against him in the Northern District of Illinois. In Illinois, the statute of limitations for personal injury torts is two years. *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir.1992); 735 ILCS 5/13–202." *Id.* She therefore applied the Illinois two-year statute of limitations and dismissed the claim. *Id.*[8]

In *Cedillo v. TransCor America, LLC*, 131 F. Supp. 3d 734, 743-44 (M.D. Tenn. 2015), a § 1983 action, the plaintiffs sued TransCor, a government contractor that transported prisoners. The prisoner plaintiffs asserted claims based on lengthy delays and substandard conditions of transportation between institutions. The claims arose from trips to "six different states, which ha[d] different statutes of limitations of varying lengths." *Id.* The court separately applied the statute of limitations of each individual state to the particular claim involving that state.[9]

---

[8]    Although *Burke* did not say so, New Jersey law probably would have produced the same result. *See also Elhassan v. Goss, supra* (applying the *Kato* rule and applying foreign state's statute of limitations, but noting that the result would have been the same under forum state's law).

[9]    The *Cedillo* court's analysis—a sixfold application of *Kato*—is worth quoting at length:

> Both the Sixth and Ninth Circuits look to the statute of limitation of the state in which the claim arose when presented with Section 1983 claims. [citing *Kuhnle, supra; Faile, supra*]. A Section 1983 claim arises "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." [citing *Wallace v. Kato, supra*]. As has been made clear by the history of this case, the length of each Plaintiff's trip with Defendants is an integral aspect of his claim....It follows that a Plaintiff's cause of action is only complete at the end of the trip and his claim "arises" in the terminus state.
>
>    The relevant statute of limitations is therefore that of the state in which each Plaintiff's trip with Defendants ended. The states and applicable statutes of limitations are: California/two years for Plaintiffs Cedillo and Houston; New Jersey/two years for Plaintiffs Greenemeier and Amo; South Carolina/three years for Plaintiff Cleaves; New York/three years for Plaintiff Wright; Wisconsin/six years for Plaintiff Roussell; and Michigan/three years for Plaintiff Hugall.

*Cedillo*, 131 F. Supp. 3d at 744.

In short, the courts have applied the *Kato* rule, both in cases where it makes no difference and in cases (like this one) where it does. I will follow suit, and apply the statute of limitations of the state in which the cause of action arose. I find that the applicable state is New York.

This constitutional malicious prosecution tort consists of the initiation of criminal proceedings without probable cause, resulting in a deprivation of liberty, followed by termination of the criminal case in the plaintiff's favor.[10] The cause of action is not complete until such termination; for example, plaintiff cannot sue, and the statute of limitations does not begin to run, until then. *See Rose*, 871 F.2d at 349. The malicious prosecution claim therefore "arises" at the time of such termination.

Aleynikov's malicious prosecution claim is based on a federal prosecution initiated by the U.S. Attorney's Office for the Southern District of New York. All decisions about whether and how to prosecute him were made by the U.S. Attorney's Office in New York. Any decision about whether probable cause existed, too, was made there. Aleynikov sues two FBI agents based on their part in causing that New York federal prosecution to be brought. Aleynikov was tried and convicted in the U.S. District Court for the Southern District of New York, and he served 51 weeks' imprisonment following that conviction.[11] The favorable termination of proceedings—the event that causes a malicious prosecution claim to "arise"—occurred in New York, when Aleynikov's conviction was overturned by the U.S. Court of Appeals for the Second Circuit.

---

[10]     Malicious prosecution under 42 U.S.C. § 1983 requires that "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Halsey v. Pfeiffer*, 750 F.3d 273, 296–97 (3d Cir. 2014) (citing *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)). *Accord Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003). The elements of a *Bivens* malicious prosecution tort are the same. *See Telfair v. Tandy*, Civ. No. 08-731, 2008 WL 4661697, at *10 (D.N.J. Oct. 20, 2008) (citing *Johnson*); *Pellegrino v. U.S. Transp. Sec. Admin.*, 855 F. Supp. 2d 343, 362 (E.D. Pa. 2012).

[11]     The record does not state whether the sentence was served in an institution located in New York State.

Defendants highlight certain events that occurred in New Jersey: Aleynikov's arrest at Newark Airport, the search of him incident to that arrest, and the search of his New Jersey home. (*See* Am. Cplt. ¶ 57) If Aleynikov's cause of action were confined to the wrongful arrest or search, I might be more inclined to agree with defendants. The claim here, however, is malicious *prosecution*; the gist of it, by definition, lies in the ultimately unsuccessful federal prosecution of Aleynikov in New York.

I therefore hold that, under the rule of *Wallace v. Kato*, the *Bivens* malicious prosecution cause of action arose in New York, and requires that I apply New York's three year statute of limitations.

### 3.   Miscellaneous arguments

Defendants offer miscellaneous arguments for setting aside the *Kato* analysis and applying some other rule or principle. I am unpersuaded.

Defendants point out that Aleynikov, a New Jersey resident, chose to file suit in New Jersey. The amended complaint's venue allegations, too, highlight New Jersey events: Aleynikov's arrest and the two searches. (*See* Am. Cplt. ¶ 57) The venue allegations of the complaint do not settle the relevant question: where the cause of action arose. In *Cedillo,* for example, the case was filed in the Northern District of California, but venue was transferred to the Middle District of Tennessee for reasons of convenience. *Cedillo* held that, under the rule of *Kato,* the transfer of forum did not matter: "As a threshold matter, the fact that this case originated in the Northern District of California has little bearing on the statute of limitations analysis." 131 F. Supp. 3d at 744.

Of course, even a case arising elsewhere must have *some* connection to the forum, or venue could not be laid there at all. A case may be brought, for example, in a district where a defendant resides, where a "substantial part" of the events giving rise to the claim occurred, or where plaintiff resides. *See generally* 28 U.S.C. § 1391. Indeed, venue may be permissible in more than one state. The venue analysis is distinct from, and therefore is no substitute for, the court's analysis and identification of the state where the claim arose.

Defendants next suggest that general federal choice of law principles require that *Kato* be set aside. The argument runs like this: Because a *Bivens* claim is a federal cause of action, a federal common law choice of law rule must be used to resolve any choice of law issues. *See San Lucio, S.r.l. v. Import & Storage Services, LLC*, Civ. No. 07-3031, 2009 WL 1010981, at *3 (D.N.J. April 15, 2009) ("In a federal question case, a district court must apply federal common law choice of law rules to determine which jurisdiction's law applies."). This case arises from facts that occurred in both New York and New Jersey, a classic choice of law dilemma. Under certain federal choice of law rules, the forum state's statute of limitations should apply unless the plaintiff demonstrates that the application of the forum's limitations period would "seriously frustrate" the policy underlying the federal cause of action or "work severe hardship to the litigants." *Consol. Express, Inc. v. New York Shipping Ass'n, Inc.*, 602 F.2d 494, 507-08 (3d Cir. 1979), *vacated on other grounds*, 448 U.S. 902 (1980).

On this issue, all of the cases cited by defendants arise, not from *Bivens* or § 1983 claims, but from claims created by federal statutes such as the LMRA or ERISA. *See Consol. Express, supra* (LMRA); *Gluck v. Unisys Corp.*, 960 F.2d 1168 (3d Cir. 1992) (ERISA); *Eichleay Corp. v. International Ass'n of Bridge, Structural and Ornamental Iron Workers*, 944 F.2d 1047, 1060 (3d Cir. 1991)(NLRA). In such cases, the courts, lacking any other guidance, began from the default assumption that the statute of limitations to be borrowed is that of the forum state. *Consol. Express*, 602 F.2d at 506 (noting that the court was operating in "a vacuum" without an express limitations period); *Gluck*, 960 F.2d at 1180 (starting from the "general rule" applying the forum state's statute of limitations under federal choice of law principles); *Eichlaey*, 944 F.2d at 1062. The parties have cited no case in which courts have applied federal common law conflict of laws principles to a *Bivens* action.[12]

_____

[12]    *See* ECF no. 13-1 ("Def. SJ Br.") p.8 n.3 ("We realize that all of the foregoing cases involved a federal statutory cause of action lacking a limitations period. We are

True, Section 1983, like ERISA or LMRA, is a federal statute, and *Bivens* is a parallel implied cause of action. Like other federal statutes, these civil rights causes of action lack an explicit limitations provision and must borrow one from state law. But we are not operating in a "vacuum." As discussed above, under *Kato* these civil rights causes of action have their own, dedicated rule about which state's statute should be borrowed. The policy-dependent, federal common law default principle cited by defendants seems to be a gap-filler, not a strong, independent principle. I do not find it appropriate to apply it when the case law specifically applicable to § 1983 and *Bivens* actions is to the contrary. In short, the application of the statute of limitations of the state where the claim arose *is* the federal rule of choice that applies here.[13]

It is very far from evident on the face of the complaint that plaintiff's malicious prosecution claims arising from his federal prosecution are time-barred. *Benak,* 435 F.3d at 400 n.14. The parties agree that if New York's three year statute applies, then the claim is timely. Finding that it does apply, I therefore deny the motion to dismiss on statute of limitations grounds.

**B.     Qualified Immunity**

Defendants argue that Counts 1–4 are barred by qualified immunity. "[Q]ualified immunity shields government officials from civil liability as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McGreevy v. Stroup,* 413 F.3d 359, 364 (3d Cir. 2005) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).

Qualified immunity issues (such as whether a violation was "objectively apparent" under the circumstances at the time) may often require the kind of

---

aware of no case addressing the choice of law issue in the context of a *Bivens* claim (or any other federal implied cause of action).").

[13]     The distinction may be that most federal statutory causes of action are created from whole cloth by Congress. By contrast, civil rights causes of action, like this one for malicious prosecution, are essentially federalizations of traditional state-law torts. Thus it makes sense that the statute of limitations would follow the tort. I offer this as speculation; it makes no difference to the result.

factual context that is available only on summary judgment or at trial. Nevertheless, when a qualified immunity issue is raised on a motion to dismiss, the Court is obligated to address it. "'[U]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985)). As *Thomas* implies, at the pleading stage such a clear violation need only be alleged, not proven. "The focus of the qualified immunity inquiry is on the allegations ...." *Lagano,* 769 F.3d at 859.

The qualified immunity analysis has two parts:

(1) The court must "determine whether the facts, and inferences drawn therefrom, taken in the light most favorable to the plaintiff, establish that the official's conduct violated a constitutional right." *McGreevy*, 413 F.3d at 364 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001)). This step is functionally equivalent to the standard on a Rule 12(b)(6) motion to dismiss.

(2) The court must "determine whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known." *Id.* (citing *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000)). This step requires "that in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent." *McGreevy*, 413 F.3d at 366 (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692 (1999)). *See also Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508 (2002).

The court has discretion to analyze the steps in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808 (2009) (partially overruling *Saucier, supra,* and no longer requiring courts to determine issues (1) and (2) in that order). I consider 1, then 2, but that choice is fairly arbitrary; the reasonableness of the officer's perception of the law, for example, is essential to both steps.

### 1.   Constitutional violation

A viable malicious prosecution claim, whether under § 1983 or *Bivens,*[14] requires that "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Halsey v. Pfeiffer,* 750 F.3d 273, 296–97 (3d Cir. 2014) (citing *Johnson v. Knorr,* 477 F.3d 75, 82 (3d Cir. 2007)).

### a.   Initiation of proceedings

Defendants contest the first element of a malicious prosecution claim, *i.e.,* the defendant's initiation of criminal proceedings. Although criminal proceedings are typically initiated by prosecutors, liability may attach to a law enforcement officer who "influenced or participated in the decision to institute criminal proceedings." *Halsey,* 750 F.3d at 297. For example, liability exists where investigators "conceal and misrepresent material facts" to the prosecutor, and such misconduct is a "significant cause of the prosecution." *Id.* at 297 & n.22;[15] *see also Hartman v. Moore,* 547 U.S. 250, 263, 126 S. Ct. 1695 (noting that a malicious prosecution plaintiff cannot establish the necessary causal chain if the decision to prosecute was independent of the

---

[14]   As discussed *supra,* a *Bivens* claim is the federal equivalent of a § 1983 claim, and requires federal rather than state government action. In general, "the analysis established under one type of claim is applicable under the other." *Collins v. F.B.I.,* Civ. No. 10-03470, 2011 WL 1627025, at *6 (D.N.J. April 28, 2011). The parties also assume, as do I, that a Fifth Amendment malicious prosecution claim would be similar. (*See* Def. SJ Brf. p. 15; ECF no. 20 ("Opp. Brf.") p. 32) One possible distinction might relate to the fifth element, a deprivation of liberty. (*See* Def. SJ Brf. p. 15). The Fourth Amendment protects against a seizure that is warrantless or unreasonable; it secures "[t]he right of the people to be secure in their persons, houses, papers, and affects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fifth Amendment protects against a deprivation of liberty without due process; it provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. The distinction is not important for present purposes.

[15]   *Halsey* declined to decide "how strong the connection must be between a police officer's misconduct and the defendant's eventual prosecution" for liability to attach. 750 F.3d at 297 n.22.

misconduct) (citing *Dellums v. Powell*, 566 F.2d 167, 192-93 (D.C. Cir. 1977)); *Peterson v. Bernardi*, 719 F. Supp. 2d 419, 431 n.12 (D.N.J. 2010) (in § 1983 malicious prosecution case, plaintiff must demonstrate "that the misconduct significantly contributed to the decision to prosecute") (citation omitted).

Here, Aleynikov sues two investigating agents, FBI Special Agent McSwain and his supervisor.[16] Plaintiff alleges that McSwain engaged in misconduct that meets the standard of substantial involvement:

> Agent McSwain falsely attested to members of the United States Attorney's Office for the Southern District of New York ... in a successful attempt to improperly influence the decision to indict Plaintiff and continue his malicious Federal Prosecution, that: (a) Aleynikov had stolen "the entire platform" of confidential trade secret computer source code Goldman Sachs used to conduct HFT; (b) the allegedly stolen source code was worth "a billion dollars"; (c) Goldman Sachs could suffer immediate and irreparable harm as a result of the alleged theft; and (d) there was a danger that the allegedly stolen source code could be used to "manipulate markets in unfair ways" ....

(Am. Cplt. ¶ 33; *see also* ¶ 12 (alleging that McSwain falsely told prosecutors that Plaintiff transported "goods, wares, or merchandise" in interstate commerce in violation of the NSPA and that plaintiff had stolen a trade secret included in or related to a "product produced for or placed in interstate or foreign commerce" in violation of the EEA)).[17]

---

[16]    Plaintiff does not sue the prosecutors involved, presumably because they would assert the defense of absolute immunity. *See Imbler v. Pachtman,* 424 U.S. 409, 96 S. Ct. 984 (1976); *Kulwicki v. Dawson,* 969 F.2d 1454, 1463 (3d Cir. 1992).

[17]    Plaintiff also argues that McSwain is responsible for initiating the federal prosecution against Aleynikov because he signed the criminal complaint. However, it appears that the U.S. Attorney's Office was heavily involved in preparing the complaint. *See* ECF no. 8-1 p. 17 (stating that the U.S. Attorney's office drafted the complaint); ECF no. 13-6 p. 2 (reflecting that AUSA Joseph Facciponti co-signed it). So this, although alleged, is also far from a foregone conclusion. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008)(unless the presumption of prosecutorial independence is rebutted, "[f]iling of a criminal complaint immunizes investigating officers ... because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time") (internal quotations and citation omitted); *see also Hartman*, 547 U.S. at 263 ("[t]his presumption that a prosecutor has legitimate grounds for the actions he takes is one we do not lightly discard....").

I am mindful of factors that call McSwain's initiation of the prosecution into doubt. For example, upon his arrest, Aleynikov confessed that he had taken the source code from Goldman Sachs (while denying illegality). Indeed, Aleynikov had the relevant source code in his possession. McSwain's characterization of the volume or value of the information (*i.e.*, that it was worth "a billion dollars" or constituted Goldman's "entire platform") would not undermine probable cause unless it fell below the minimal threshold of $5,000. *See* 18 U.S.C. § 2314 (NSPA applies to goods worth at least $5000); 18 U.S.C. § 1832 (EEA sets no value threshold).

Nevertheless, I assume (as I must) that McSwain made the false statements as alleged in the amended complaint.[18] These contentions potentially raise issues of fact that cannot be resolved on a motion to dismiss. I therefore assume *arguendo* that McSwain could be regarded as having initiated the prosecution.

### b. Probable cause

The larger issue with Aleynikov's malicious prosecution claim relates to the third, probable cause element. "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223 (1964)). Probable cause thus has a factual and a legal component, corresponding to the "information" and the "offense."

For the reasons stated in subsection (a), immediately preceding, the factual exaggerations alleged in the amended complaint do not detract from a finding of probable cause. The existence of a statutory violation did not depend, for example, on whether the code was actually worth $1 billion or constituted Goldman's entire HFT platform.

---

[18]    Defendants dispute plaintiff's version of when and by whom these statements were made. (*See* ECF no. 26 ("Reply Brf.") p. 10 n.3.)

The focus here is rather on whether the agent was warranted in believing that a criminal offense was committed as a matter of law. The Second Circuit reversed Aleynikov's conviction, holding that it was premised on an incorrect view of the law. Even assuming that Aleynikov misappropriated confidential information, said the Second Circuit, his conduct was not prohibited by NSPA and EEA, the particular federal statutes at issue. The probable cause issue, however, is slightly different; an investigator may possess probable cause based on a reasonable mistake as to the law.

In *Heien v. North Carolina*, the Supreme Court held that a reasonable mistake of law could support a finding of reasonable suspicion sufficient to justify a traffic stop. — U.S —, 135 S. Ct. 530, 524 (2014) ("Because the officer's mistake about the … law was reasonable, the stop in this case was lawful under the Fourth Amendment."). That holding has been extended to the context of probable cause. *See Cahaly v. Larosa*, 796 F.3d 399, 408 (4th Cir. 2015)("[O]fficers may have probable cause to arrest based on 'reasonable mistakes of law'") (quoting *Heien*); *J Mack LLC v. Leonard*, Civ. No. 13-808, 2015 WL 519412, at *9 (S.D. Ohio Feb. 9, 2015)(expressing "no reservation in extending *Heien*'s rationale to the probable cause analysis, especially given that the Supreme Court's decision is based in part on nineteenth century precedent that it characterized as establishing the proposition that a mistake of law can support a finding of probable cause") (citation omitted); *see also U.S. v. Diaz*, 122 F. Supp. 3d 165, 174-75 (S.D.N.Y. 2015).

I am constrained to find that at the time of Aleynikov's prosecution, a belief that he had violated the NSPA and EEA constituted a reasonable mistake of law. Trained prosecutors accepted the theory of prosecution. More to the point, a federal district judge twice analyzed and accepted it. That it was ultimately rejected by the Second Circuit does not imply that, from the point of view of the agent at the time, there was not probable cause to support the federal charges. I further analyze the reasonableness of the agents' view of the law in the following subsection.

Because the agent's presentation of the case for prosecution was reasonably based on facts admitted by Aleynikov and a reasonable, even if incorrect, view of the law, I cannot find that probable cause was lacking. Based on the analysis of this, the first component of the qualified immunity analysis, I would dismiss Counts 1–4.

### 2.   "Clearly established" violation

It is not strictly necessary to proceed to the second step of the qualified immunity analysis: whether the federal agents violated any "clearly established" rule of law. I will, however, discuss it, because the "reasonable mistake" doctrine, *see supra,* and the "clearly established" inquiry are intertwined, and the latter provides an alternative basis for dismissal.

Even where a violation is established, qualified immunity protects government officials from liability for damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808 (2009) (quoting *Harlow*, 457 U.S. at 818). The error may relate to the law, the facts, or some mixture of the two. *Id.* (citing *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284 (2004) (Kennedy, dissenting); *Butz v. Economou*, 438 U.S. 478, 507, 98 S. Ct. 2894 (1978)(qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986)). As long as an official reasonably believes that his or her conduct complies with the law, qualified immunity will shield the official from liability. *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citation omitted).

Aleynikov urges that McSwain's belief that his conduct violated the NSPA and EEA was "*objectively and patently unreasonable.*" (Opp. Brf. p. 25) (emphasis in original). At the time of Aleynikov's prosecution, he says, the application of the NSPA to intangible property "was foreclosed as a matter of law by controlling Supreme Court and Second Circuit precedent." (*Id.* p. 23)

22

Similarly, he adds, the notion that Goldman's HFT platform was "produced for or placed in interstate or foreign commerce" under the EEA "was foreclosed as a matter of law by the statute's plain language and longstanding maxims of statutory construction." (*Id.* p. 25)

I cannot agree. Plaintiff is correct by definition that the NSPA and EEA did not, in fact, apply to Aleynikov's conduct—the Second Circuit has now so ruled.[19] But the Second Circuit's decision does not necessarily establish that an officer in McSwain's position would have been unreasonable believing that Aleynikov violated these statutes. The U.S. Attorney's Office for the Southern District of New York—lawyers (unlike McSwain) who prosecuted the case to trial—thought so. So did the jury who convicted him (based on the District Judge's instructions as to the applicable law). District Judge Cote considered plaintiff's arguments about the inapplicability of the NSPA and EEA both before trial and in post-trial motions. That learned Senior Judge, experienced in criminal matters, wrote two opinions upholding the indictment and verdict against Aleynikov's legal challenges. Nor were these perfunctory or offhand rulings; they are cogently based on existing authority, and they make reasonable arguments for distinguishing certain of the cases later relied on by the Second Circuit. *See Aleynikov*, 737 F. Supp. 2d at 177-190; *Aleynikov*, 785 F. Supp. 2d at 60-61. True, Judge Cote's decision was ultimately overruled by the Second Circuit.[20] But this is, on its face, an issue of law on which reasonable minds could and did differ.

---

[19]   In doing so, the Second Circuit stated that "Aleynikov should have known [his conduct] was in breach of his confidentiality obligations to Goldman, and was dishonest in ways that would subject him to sanctions; but he could not have known that it would offend this criminal law or this particular sovereign." *Aleynikov*, 676 F.3d at 82.

[20]   It happens. *See Aleynikov v. Goldman Sachs Grp., Inc.,* 765 F.3d 350 (3d Cir. 2014), *reversing* 2013 WL 5739137 (D.N.J. Oct. 22, 2013) (McNulty, J.).

Subsequent events, of course, do not bear on the agents' knowledge at the time. To complete the story, however, I note that after the Second Circuit's ruling, Congress amended the EEA to clarify its intent that it cover conduct like Aleynikov's. *See U.S. v. Agrawal*, 726 F.3d 235, 244 n.7 (2d Cir. 2013)("*Alenikov*'s identification of a congressional intent to limit the reach of the EEA has since been disavowed by

Despite this context, plaintiff basically says that Agent McSwain should have known better.[21] Aleynikov asks me to hold McSwain responsible for a flawed legal theory that was endorsed by numerous lawyers and twice explicitly upheld by a federal district judge before an appellate panel ultimately ruled the other way. On this record, I cannot find that at the time of Aleynikov's prosecution it was objectively unreasonable for an agent to believe that the NSPA and EEA applied to his conduct. *See Marcavage v. National Park Service*, 666 F.3d 856, 859 (3d Cir. 2012)(finding that disagreement among judges "indicate[d]" that the constitutional right at issue "was not clearly established").

No binding authority of which a reasonable agent would have known clearly established that the statutes did not cover this conduct. Accordingly, I find that McSwain is entitled to qualified immunity as to Counts 1–4.

### C.   Allegations against Special Agent Casey

Special Agent Casey, McSwain's supervisor, is also named as a defendant in connection with Aleynikov's federal prosecution.[22] Plaintiff alleges that Casey should be liable for malicious prosecution because he had personal knowledge of, directed, and acquiesced in, the malicious prosecution of Aleynikov. (*See* Am. Cplt. ¶ 2, (alleging that Casey assigned McSwain to Aleynikov's case); ¶ 65

---

Congress itself, which quickly amended the EEA to remove the purportedly limiting language and to clarify its intent to reach broadly in protecting against the theft of trade secrets.").

[21]   Plaintiff emphasizes the subjective knowledge of Agent McSwain at the time of Aleynikov's arrest, including his testimony during a suppression hearing in connection with the state prosecution, in which he stated that he had not read the EEA before Aleynikov's arrest. (*See* Opp. Brf. pp. 27-28) However, the Court in *Heien* stated that the mistake of law must be "*objectively* reasonable," meaning that "[w]e do not examine the subjective understanding of the particular officer involved." (emphasis in original) (citation omitted).

[22]   Plaintiff lists Casey as a defendant (in addition to McSwain and John Does) only in Count 1. (*See* Am. Cplt. p. 29) The remaining counts list only McSwain and the John Does. (*See id.* pp. 31–41) Plaintiff's briefing, however, discusses Casey in connection with other counts. (*See, e.g.*, Opp. Brf. p. 32 ("Agent McSwain, supervised by Agent Casey ... also violated [Aleynikov's] Fifth Amendment right to procedural due process.")). I will assume for purposes of discussion that Aleynikov intended to include Casey as a defendant in Counts 1–4, the malicious prosecution claims arising from the federal prosecution. (*See* Am. Cplt. pp. 3-5)

(alleging that Casey granted McSwain's request to initiate an investigation of Aleynikov); ¶ 68 ("Agents McSwain and Casey substituted blind reliance on Goldman Sachs, an interested party, for any meaningful investigation of the facts...")). I have already found that the allegations relating to McSwain's misconduct are deficient; allegations of Casey's knowledge and acquiescence in such misconduct fall with them. The claims against Casey are dismissed for the same reasons Counts 1–4 are dismissed against McSwain.[23]

## IV.   MALICIOUS PROSECUTION – NY State Charges (Counts 6–9)[24]

Counts 6–9 assert malicious prosecution in relation to the New York state charges that followed the dismissal of the federal charges. Aleynikov alleges that Agent McSwain, especially since he now knew the basis for the federal dismissal, should have been aware of the flaws in the parallel state charges, but nevertheless vengefully pursued them. Defendants move to dismiss Counts 6–9 because the state charges, viewed overall, have not terminated in plaintiff's favor.

The three counts in the state indictment are closely interrelated:

(a) Count 1 charged Aleynikov with Unlawful Use of Secret Scientific Material arising from his June 1, 2009 conduct. The state jury hung on Count 1.

---

[23]   Defendants also contend that plaintiff has not sufficiently alleged the personal involvement of Casey. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)("A defendant in a civil rights action must have personal involvement in the alleged wrongs."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937 (2009)("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). It is unnecessary to reach the issue.

[24]   Plaintiff's brief at times implies that Counts 6–9 are asserted against Agent Casey, as well as McSwain. (*See, e.g.*, Opp. Brf. p. 44 ("Agents McSwain And Casey Are Not Entitled to Qualified Immunity As To The State Prosecution Because The Rights They Violated Were Clearly Established.")). The counts themselves do not mention Casey, or demand relief against him. *See, e.g.*, Am. Cplt. Count 6, prayer for relief (following ¶ 144) ("WHEREFORE, Plaintiff, Sergey Aleynikov, demands judgment against Defendants, Agent Michael McSwain and John Does 1-10, on the Sixth Count of this Complaint...."). Counts 7–9 are similar.

(b) Count 2 charged Aleynikov with violation of the same statute, based on the events of June 5, 2009. The jury convicted Aleynikov on Count 2.

(c) Count 3 charged Aleynikov with Unlawful Duplication of Computer Related Material based on the events of June 5, 2009 (the same date as Count 2). Aleynikov was acquitted on Count 3. *Id.*

On post-trial motions, Judge Conviser dismissed both Counts 1 and 2 as a matter of law. (*See* ECF no. 8-2 p. 1) That order is currently on appeal to the Appellate Division, First Department.[25] Defendants argue that because Count 2 (at least) is pending on appeal and has not been finally terminated in Aleynikov's favor, the malicious prosecution claims arising from the state proceedings should be dismissed as premature.

"[A] prior criminal case must have been disposed of in a way that indicates the innocence of the accused in order to satisfy the favorable termination element" of a malicious prosecution claim. *Kossler v. Cristani*, 564 F.3d 181, 187 (3d Cir. 2009) (citation omitted). A plaintiff can demonstrate favorable termination through:

(a) a discharge by a magistrate at a preliminary hearing, or

(b) the refusal of a grand jury to indict, or

(c) the formal abandonment of the proceedings by the public prosecutor, or

(d) the quashing of an indictment or information, or

(e) an acquittal, or

(f) a final order in favor of the accused by a trial or appellate court.

*Id.*

The favorable termination requirement is intended to prevent "the creation of two conflicting resolutions arising out of the same or identical transaction." *Heck v. Humphrey*, 512 U.S. 477, 484, 114 S. Ct. 2364 (1994)

---

25    The State says it appealed the entire order as to both counts. Aleynikov insists that the portion of the order dismissing Count 1 is not appealable. That issue will no doubt be fought out in the Appellate Division; it is unnecessary to resolve it for present purposes.

(internal quotations and citation omitted). That concern is acute here. Counts 1 and 2 were brought under the same statute (Unlawful Use of Secret Scientific Material), and the court dismissed both on grounds of legal and statutory interpretation. Count 3, the count of acquittal, was brought based on the same events of June 5, 2009 that underlie Count 2, but under a different statute (Unlawful Duplication).

If the dismissal of Aleynikov's conviction on Count 2 were upheld on appeal, there would be no inconsistency; both Count 2 and Count 3 (the count of acquittal) would then have been terminated favorably. Some awkward maneuvering might be required, however, to resynchronize plaintiff's causes of action.

If in the alternative the Count 2 conviction were reinstated on appeal, this Court would face a split decision (plus the mistrial on Count 1). If there were already a malicious prosecution judgment on Count 3, the result could be inconsistent judgments. But even if the malicious prosecution case on Count 3 had not concluded, the court would have to reassess—considering, for example, whether the proceedings as a whole had terminated in Aleynikov's favor. *See generally Kossler*, 564 F.3d at 187–93. The rule requiring termination in plaintiff's favor was designed to avoid such issues.

The charges in Counts 2 and 3 are closely interrelated. All of the malicious prosecution allegations relating to the state prosecution should be litigated together in this action. Because the state case is not finally terminated, at least as to Count 2, there is a substantial risk that proceeding with the malicious prosecution claims could result in inconsistent judgments. At the very least it would disrupt the smooth progress of this case.

The question is what to do while the state appeal is pending. Defendants argue that Counts 6–9 are simply premature; Aleynikov's causes of action have not yet ripened, and should therefore be dismissed. Plaintiff, on the other hand, argues for a stay.

It is true that courts have dismissed malicious prosecution claims when the favorable termination element is lacking. *See, e.g., Blow v. Paterson Police*

*Dept.*, Civ. No. 11–4268, 2012 WL 266433, at *3 (D.N.J. Jan. 30, 2012) (dismissing claim where defendant pleaded guilty to one count and the other was dismissed as part of the plea agreement). Here, however, the situation is different. It's not that Count 2 was decided in the State's favor; it's just that it is too early to say whether its resolution in Aleynikov's favor will stick. I therefore think it is appropriate, not to dismiss the malicious prosecution claims, but to stay them pending the outcome of the appeal in New York. *See Linnen v. Armainis*, 991 F.2d 1102, 1107 (3d Cir. 1993)(noting a "preference for holding federal civil rights claims in abeyance until state appellate proceedings that may affect the outcome of the federal action are decided"); *Herrera v. City of New Brunswick*, Civ. No. 04-3002, 2008 WL 305275, at *10 (D.N.J. Feb. 1, 2008)(staying § 1983 malicious prosecution claim pending the outcome of defendant's appeal of her conviction).

In sum, I will deny the motion to dismiss Counts 6–9 at this time. Instead, I will stay these counts pending the outcome of the appeal in New York State court.

## V.   RETENTION OF PROPERTY (Count 5)

The federal government seized and retained Aleynikov's passports and other personal property at the time of his arrest. (Am. Cplt. ¶¶ 81–89) They remained in government custody as a condition of his federal bail. When the federal conviction was reversed, his attorney requested the property's return. The federal government did not return the property, but transferred it to the office of the New York County District Attorney, which retained it for the purposes of the state prosecution. Count 5 alleges that this course of conduct constituted a clear violation of Aleynikov's Fourth and Fifth Amendment rights. Defendants respond that there was no constitutional violation, and that if there had been, qualified immunity would apply because a reasonable officer would not have been on notice that his behavior violated the Constitution. [26]

---

[26]    Two other grounds require no extended discussion. Defendants ask me to dismiss Count 5 on statute of limitations grounds. I decline to do so for the reasons

Under the Fourth Amendment, an initially permissible seizure of property may become unreasonable as time goes on. "[N]ormally ... the government's *continued* possession is not separately actionable as a Fourth Amendment violation." *Gonzalez v. Village of West Milwaukee*, 671 F.3d 649, 660 (7th Cir. 2012) (emphasis in original; citation omitted). However, "a seizure reasonable at its inception because based on probable cause may become unreasonable as a result of its duration...." *Segura v. United States*, 468 U.S. 796, 812, 104 S. Ct. 3380 (1984). *See United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014) (retention of computer, containing both relevant and non-relevant data, for two years without sufficient basis).[27]

By hypothesis, the authorities would have been justified in retaining the property throughout the period of the federal investigation and prosecution. *See U.S. v. Clenney*, Civ. Nos. 92-7265, 93-6273, 1994 WL 233296, at *2 (4th Cir. May 31, 1994) ("An ongoing criminal investigation constitutes sufficient

---

discussed in connection with Counts 1–4. *See* Section III.A, *supra*. Defendants also assert that McSwain's personal involvement has not been sufficiently alleged. I do not find plaintiff's allegations deficient in this respect. (*See* Am. Cplt. ¶ 82 (alleging that McSwain received the phone call from Aleynikov's counsel requesting return of his passport and items "seized from Plaintiff in connection with the Federal Prosecution"); ¶ 88 ("[A]fter procuring Judge Cote's Unsealing Order, Agent McSwain, aided by one or more FBI agents and prosecutors from the United States Attorney's Office, ignored Plaintiff's request for the return of his property and instead turned that property over to the DANY.")

[27]     Aleynikov claims in the alternative that the retention of his passports and other property violated his Fifth Amendment right to due process of law. Defendants respond that a motion for return of property, pursuant to Fed. R. Crim. P. 41(g), provides an adequate remedy, but that Aleynikov failed to take advantage of it. "[W]hen a state officer randomly and without authorization departs from established state procedures, the state need only provide post-deprivation procedures," as opposed to a pre-deprivation hearing. *Revell v. Port Authority of New York, New Jersey*, 598 F.3d 128, 137 (3d Cir. 2010) (citing *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543, 101 S. Ct. 1908 (1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662 (1986); *see also Lathon v. City of St. Louis*, 242 F.3d 841, 843 (8th Cir. 2001)(stating that "the rationale behind the *Parratt/Hudson* doctrine is that states could not predict and therefore could not be expected to safeguard against random and unauthorized deprivations through predeprivation process"). Whether the alleged deprivation resulted from established procedures, or was a one-shot departure from them, among other matters, cannot be settled from the face of the pleadings.

continuing interest to warrant denial of a motion to return property.") Of course, the federal proceedings were exhausted at some point. The federal convictions were overturned by the Second Circuit by order entered February 16, 2012 (and amended February 17, 2012). That order reversed the conviction and directed that Aleynikov be released on bail pending issuance of the mandate. 476 F. App'x 473, 2012 WL 591980. The court did not file its opinion, however, until April 11, 2012.[28] 676 F.3d 71. On June 22, 2012, Aleynikov's lawyer requested the return of the property. (*See* Am. Cplt. ¶ 82) The amended complaint states that the District Attorney's investigation was opened "[s]hortly after" Aleynikov's acquittal, but apparently the date is unknown to Aleynikov. (*See* Am. Cplt. ¶ 81; ECF no. 13-3 p. 2) Because the government's request to unseal the relevant materials was filed on July 12, 2012, the state investigation must have been opened by then, at the latest.

District Judge Cote then entered an order unsealing the record to the limited extent of permitting the federal prosecutors to share their evidence with the State. That order recited that Aleynikov was "seeking return of his passport and is planning to travel to Russia in the near future." (ECF no. 13-3 at 3) The following items were "unsealed for the limited purpose of allowing the Government to provide them to DANY for that office's investigation and potential prosecution of Aleynikov: (A) any sealed portions of the trial transcript in this case, (B) any sealed trial exhibits in this case, (C) the unredacted versions of any redacted trial exhibits in this case; (D) any other material subject to the protective orders in this case." (*Id.* at 3) Judge Cote's order was itself sealed "[d]ue to the risk that Aleynikov may flee prosecution if he learns of the existence of DANY's investigation...." (*Id.* at 4)

Accepting plaintiff's allegations as true and giving him the benefit of all inferences, the federal government's lawful basis for retention of the property

---

[28]   Before seeing the court's opinion, the government could not have definitively determined whether to pursue further review. The record does not reveal whether the government considered petitioning for review en banc or a writ of certiorari, which could have added 90 days, *see* U.S. Sup. Ct. R. 13. That review period may account in part for defense counsel's waiting until June 2012 to request return of the property.

may have expired. What happened then, according to the complaint, is that the government feared that Aleynikov, no longer under bail supervision, would travel to Russia. It therefore engineered a *de facto* travel restriction by simply refusing to return the passports and transferring them to the state authorities pursuant to an "unsealing" order. At the time, the State was investigating but had not yet charged Aleynikov. McSwain's involvement is alleged, though it, too, remains to be established.

As the defense points out, such a claim has potential vulnerabilities: the immunity of the chief participants, uncertainty as to the level of McSwain's involvement, the scope of authorization afforded by Judge Cote's order, and so on. Once the factual parameters are established, the Court may also revisit the issue of whether all or part of this *Bivens* cause of action is barred by the existence of alternative remedies. *Minneci v. Pollard*, __ U.S. __, 132 S. Ct. 617, 623-26 (2012)

Those issues, however, are for another day. I find that Count 5 sufficiently alleges a claim, and the motion to dismiss it at the outset is denied. Because Count 5 is inextricably intertwined with the initiation of state proceedings as alleged in Counts 6–9, I will likewise stay it in the interest of efficient case management.

## VI.   *BIVENS* CONSPIRACY (Count 10)

"The established rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability." *In re Orthopedic Bone Screw Liability Litig.*, 193 F.3d 781, 789 (3d Cir. 1999); *see also Toolasprashad v. Wright*, Civ. No. 02-5473, 2006 WL 2264885, at *5 (D.N.J. Aug. 8, 2006)(one of the elements of a *Bivens* conspiracy claim is "an actual deprivation" of constitutional rights). Here, I have found no such violation of Aleynikov's constitutional rights. Therefore, the *Bivens* conspiracy claim is dismissed and stayed to the same extent that I have dismissed and stayed the underlying claims.

## VII.   CONCLUSION

For the foregoing reasons, I will partially grant defendants' motion to dismiss. (ECF no. 13) Counts 1–4 are dismissed in their entirety with prejudice. The motion to dismiss is denied as to Count 5. Counts 5–9 are stayed pending resolution of the government's appeal in state court. Count 10 (conspiracy) is dismissed in part and stayed in part to the same extent as the underlying substantive claims. An appropriate order is filed with this opinion.

Dated: June 15, 2016
Newark, New Jersey

**KEVIN MCNULTY**
**United States District Judge**